CROSNER LEGAL, P.C.
Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Michael T. Houchin (SBN 305541)
mhouchin@crosnerlegal.com
Kurt D. Kessler (SBN 327334)
kurt@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOE SQUEO and TIFFANY TAYLOR, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CAMPBELL SOUP COMPANY and SNYDER'S-LANCE, INC.,<br><br>Defendants. | Case No. 5:24-cv-02235-SVK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Joe Squeo and Tiffany Taylor ("Plaintiffs") individually, and on behalf of all others similarly situated, and the general public, by and through undersigned counsel, hereby bring this action against Campell Soup Company and Snyders-Lance, Inc. (together, "Defendants"), and upon information and belief and investigation of counsel, alleges as follows:

### INTRODUCTION

1.    This is a consumer class action for violations of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), breach of express warranty under California law, and for violations of New York General Business Laws §§ 349 and 350.

2.    Defendants manufacture, distribute, advertise, and sell Cape Cod-branded Kettle Cooked Potato Chips products. The packaging prominently displays on the front of the label that these Products[1] contain "**No Artificial Colors, Flavors, or Preservatives**."

3.    This statement is false. Each of the Products are made with citric acid—an artificial preservative used in food products.

4.    Defendants' packaging, labeling, and advertising scheme is intended to give consumers the impression that they are buying a premium product that is free from preservatives.

5.    Like other reasonable consumers, Plaintiffs were deceived by Defendants' unlawful conduct and bring this action individually and on behalf of California and New York consumers to remedy Defendants' unlawful acts.

### JURISDICTION AND VENUE

6.    In its Notice of Removal (ECF No. 1), Defendant Campell Soup Company asserts that this Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"), because the proposed Class consists of 100 or more

---

[1] "Products" means all Cape Cod brand products labeled as containing "No Artificial Colors, Flavors or Preservatives" that include citric acid as an ingredient. The Products include, but are not limited to, Cape Cod Kettle Cooked Potato Chips in the following different flavors: (1) Sea Salt & Vinegar; (2) Sea Salt & Cracked Pepper; (3) Sour Cream & Onion; (4) Sweet & Spicy Jalapeño; and (5) Sweet Mesquite Barbeque.

CROSNER LEGAL, P.C.

members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. *See* ECF No. 1.

7.    This Court has personal jurisdiction over Defendants because they conduct and transact business in the State of California, contract to supply goods within the State of California, and supply goods within the State of California. Defendants, on their own and through their agents, are responsible for the distribution, marketing, labeling, and sale of the Products in California, specifically in this district. The marketing of the Products, including the decision of what to include and not include on the labels, emanates from Defendants. Thus, Defendants have intentionally availed themselves of the markets within California through the advertising, marketing, and sale of the Products to consumers in California, including Plaintiff.

8.    The Court also has specific jurisdiction over Defendants as they have purposefully directed activities towards the forum state, Plaintiff Squeo's claims arise out of those activities, and it is reasonable for Defendants to defend this lawsuit because they have sold deceptively advertised Products to Plaintiff Squeo and members of the class in California. *See* ECF No. 1 at ¶ 28 ("During the class period, Campbell earned more than $5 million in gross revenue from purchases made in the State of California from the sale of the Products.") By distributing and selling the Products in California, Defendants have intentionally and expressly aimed conduct at California which caused harm to Plaintiff Squeo and the California class that Defendants know is likely to be suffered by Californians.

9.    Defendant Campell Soup Company asserts that "[u]nder 28 U.S.C. §§ 84(a) and 1441(a), venue is proper in the United States District Court for the Northern District of California[.]" ECF No. 1 at ¶ 9. Venue is also proper in this District pursuant to 28 U.S.C. § 1446(a) because Defendant removed this action from the California Superior Court for the County of Santa Clara.

## PARTIES

10.    Defendant Campbell Soup Company ("Campbell") is a New Jersey corporation that maintains its principal place of business at in Camden, New Jersey.

11.    Defendant Snyder's-Lance, Inc. ("Snyder's-Lance") maintains its principal place of business in Charlotte, North Carolina.

12. At all times during the class period, Defendants were the manufacturers, distributors, marketers, and sellers of the Products.

13. Defendants maintain warehouses in California and has Californian employees.[2] Defendants purposefully direct their actions towards California state as they have committed intentional acts expressly aimed at the forum state (selling, distributing, and marketing the Products in California which caused harm that the defendant knows is likely to be suffered in Californian (i.e., purchase of the Products by consumers). The sale of the Products is not an isolated occurrence.

14. On March 26, 2018, Campbell's acquired Snyder's-Lance for $6.1 billion. Denise Morrison, CEO of Campbell, states: "The combination of Campbell and Snyder's-Lance creates a unique, diversified snacking portfolio of differentiated brands and a large variety of better-for-you snacks for consumers. I am excited about the combination and confident that it will create significant shareholder value through both revenue growth and cost synergies."[3]

15. To unlock the power of the combined brand portfolio, and achieve both cost and potential revenue opportunities, Campbell integrated the Snyder's-Lance portfolio to create a unified snacking organization called Campbell Snacks: "The Campbell Snacks team will focus on optimizing the value of our U.S. snacks business to deepen our partnership with customers through the power of the combined portfolio."[4] The Cape Cod Products are part of the Campbell's brand.[5]

16. <u>Plaintiff Squeo</u> purchased the Cape Cod Kettle Cooked Sea Salt and Vinegar Potato Chips with the "No Artificial Colors, Flavors or Preservatives" label claim late last year (2023) at a retail store in California. Plaintiff Squeo has purchased the Cape Cod Salt and

---

[2]    *See* https://geebo.com/jobs-online/view/id/348435457-warehouse-coordinator-/mobile/1 (last visited May 14, 2024)

[3] https://investor.campbellsoupcompany.com/news/financial-news/news-details/2018/Campbell-Completes-Acquisition-of-Snyders-Lance/default.aspx (last visited May 14, 2024)

[4] *Id.*

[5] *Id.*

Vinegar Potato Chips approximately a dozen times at retail stores in California in the past three years. When purchasing the Products, Plaintiff Squeo didn't expect that the "No Artificial Colors, Flavors or Preservatives" statement on the label was false. Plaintiff Squeo did not expect Defendants to publicly place deceptive statements about the contents of its Products on the front label of the Products.

17.     Plaintiff Taylor has purchased the Cape Cod Kettle Cooked Potato Chips several times in the following different flavors during the last three years at retail stores near Ozone Park, New York: Sea Salt & Vinegar; Sour Cream & Onion; Sweet & Spicy Jalapeño; and Sweet Mesquite Barbeque. She last Purchased one of the Products in approximately February-March 2024. The Products Plaintiff Taylor purchased contained the "No Artificial Colors, Flavors or Preservatives" label claim. When purchasing the Products, Plaintiff Taylor didn't expect that the "No Artificial Colors, Flavors or Preservatives" statement on the label was false. Plaintiff Taylor did not expect Defendants to publicly place deceptive statements about the contents of its Products on the front label of the Products.

18.     Plaintiffs saw and relied on the "No Artificial Colors, Flavors or Preservatives" claim on the labels of the Products.  Plaintiffs would not have purchased the Products, or would have paid less for the Products, had they known that the Products contain an artificial preservative ingredient in direct contradiction to the "No Artificial Colors, Flavors or Preservatives" statement on the label. As a result, Plaintiffs suffered injury in fact when they spent money to purchase the Products they would not have purchased, or would have paid less for, absent Defendants' misconduct.

19.     Plaintiffs desire to purchase the Products again if the label of the Products was accurate and if the Products truthfully contained "No Artificial Colors, Flavors, or Preservatives." However, as a result of Defendants' ongoing misrepresentations, Plaintiffs are unable to rely on the Products' labeling when deciding in the future whether to purchase the Products. Considering the fact that the Plaintiffs have purchased the Products on several occasions and continue to see the Products for sale, they are at an imminent risk of future injury.

CROSNER LEGAL, P.C.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FACTUAL ALLEGATIONS

### "NO ARTIFICIAL COLORS, FLAVORS, OR PRESERVATIVES" IS PROMINENTLY DISPLAYED ON THE LABELS OF THE PRODUCTS

20.    The front labels for each of the Products prominently state that the Products contain "**No Artificial Colors, Flavors or Preservatives**" thereby misleading reasonable consumers into believing that the Products are free from artificially created preservatives. However, each of the Products contain the artificial preservative citric acid. Below is an example of a label for one of the Products (red circle added):

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROSNER LEGAL, P.C.

FIRST AMENDED CLASS ACTION COMPLAINT

1    21.    The back label repeats and reinforces the "**No Artificial Colors, Flavors or**

2    **Preservatives**" claim (red circle added):



FIRST AMENDED CLASS ACTION COMPLAINT

22.    The packaging for each Product contains the same "**No Artificial Colors, Flavors or Preservatives**" and is identical to the above packaging except for the identification of the flavor and coloring scheme:






CROSNER LEGAL, P.C.

FIRST AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

CROSNER LEGAL, P.C.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### THE CITRIC ACID IN THE PRODUCTS IS ARTIFICIAL

23.    Defendants use artificial manufactured citric acid in the Products.[6] Commercial food manufactures use a synthetic form of citric acid that is derived from heavy chemical processing.[7] Commercially produced citric acid is manufactured using a type of black mold called *Aspergillus niger* which is modified to increase citric acid production.[8] Consumption of manufactured citric acid has been associated with adverse health events like joint pain with swelling and stiffness, muscular and stomach pain, as well as shortness of breath.[9] Defendants do not use natural citric acid extracted from fruit in the Products. This is because "[a]proximately 99% of the world's production of [citric acid] is carried out using the fungus *Aspergillus niger* since 1919."[10] As explained by a study published in the *Toxicology Reports Journal*:

> Citric acid naturally exists in fruits and vegetables. However, **it is *not* the naturally occurring citric acid, but the manufactured citric acid (MCA) that is used extensively as a food and beverage additive**. Approximately 99% of the world's production of MCA is carried out using the fungus *Aspergillus niger* since 1919. *Aspergilus niger* is a known allergen.[11]

24.    As a technical evaluation report for citric acid, compiled by the United States Department of Agriculture Marketing Servies ("USDA AMS") further explains that it is not commercially feasible to use natural citric acid extracted from fruits:

---

[6] Iliana E. Sweis, *et al.*, *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports,* TOXICOL REP. 5:808-812 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/

[7] A. Hesham, Y. Mostafa & L. Al-Sharqi, *Optimization of Citric Acid Production by Immobilized Cells of Novel Yeast Isolates*, 48 MYCOBIOLOGY 122, 123 (2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7178817/

[8] *Id*; Pau Loke Show, *et al.*, *Overview of citric acid production from Aspergillus niger,* FRONTIERS IN LIFE SCIENCE, 8:3, 271-283 (2015), *available at* https://www.tandfonline.com/doi/full/10.1080/21553769.2015.1033653

[9] Iliana E. Sweis, *et al.*, *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports,* TOXICOL REP. 5:808-812 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/

[10] *Id.*

[11] *Id.* (emphasis added)

"Traditionally by extraction from citrus juice, [is] no longer commercially available. It is now extracted by fermentation of a carbohydrate substance (often molasses) by citric acid bacteria, *Aspergillus niger* (a mold) or *Candida guilliermondii* (a yeast). Citric acid is recovered from the fermentation broth by a lime and sulfuric acid process in which the citric acid is first precipitated as a calcium salt and then reacidulated with sulfuric acid."[12]

25.    As one of the USDA AMS reviewers commented:

"[Citric acid] is a natural[ly] occurring substance that commercially goes through numerous chemical processes to get to [its] final usable form. This processing would suggest that it be ***classified as synthetic***."[13]

26.    When asked "Is this substance Natural of Synthetic?" USDA AMS reviewers state: "synthetic."[14]

27.    Unbeknownst to consumers, in tiny print on the back of the packaging Defendants admit that the citric acid in the Products is derived from "bioengineered food ingredients" which is manufactured from "genetically modified crops." *See supra* at ¶ 21 ("Contains bioengineered food ingredients. The ingredients from sugar and corn in the product come from genetically modified crops."). Of course, a bioengineered ingredient is artificial.

28.    The FDA has determined that manufactured citric acid is not natural; it is artificial. The FDA sent warning letters to Hirzel Canning Company and Oak Tree Farm Dairy, Inc., for similar violations, saying that the FDA's policy involving the use of the word natural means that nothing artificial or synthetic has been added to the product, and that a product that labels itself "100% Natural" or "All Natural" violates that policy if it contains citric acid, and that the presence of citric acid precludes the use of the term natural to describe the product.[15]

29.    The FDA explains that the "Solvent extraction process for citric acid" is accomplished via "recovery of citric acid from conventional *Aspergillus niger* fermentation

---

[12] **Exhibit E** at page 6.

[13] **Exhibit E** at page 5 (emphasis added)

[14] **Exhibit E** at pages 4-5.

[15] *See* **Exhibit B** at page 2 and **Exhibit C** at page 2.

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

1  liquor may be safely used to produce food-grade citric acid in accordance with the following

2  conditions: (a) The solvent used in the process consists of a mixture of *n*- octyl alcohol meeting

3  the requirements of § 172.864 of this chapter, **synthetic** isoparaffinic petroleum hydrocarbons

4  meeting the requirements of § 172.882 of this chapter, and tridodecyl amine. 12 C.F.R. §

5  173.280 (emphasis added). Chemical solvents such as n-octyl alcohol and synthetic isoparaffinic

6  petroleum hydrocarbons are used to extract the citric acid that Defendants use in the Products

7  from *aspergillus niger* fermentation liquor. *See* 21 C.F.R § 173.280. The citric acid that

8  Defendants use in the Products is produced through chemical solvent extraction and contains

9  residues of those chemical solvents.

10      30.    The *Toxicology Reports Journal* study explains that "the potential presence of

11  impurities or fragments from the *Aspergillus niger* in [manufactured citric acid] is a significant

12  difference that may trigger deleterious effects when ingested."[16] The study further explains:

13      "Given the thermotolerance of A. niger, there is great potential that byproducts of
        A. niger remain in the final [manufactured citric acid] product. Furthermore, given

14      the pro-inflammatory nature of A. niger even when heat-killed, repetitive ingestion
        of [manufactured citric acid] may trigger sensitivity or allergic reactions in

15      susceptible individuals. Over the last two decades, there has been a significant rise
        in the incidence of food allergies"[17]

16

17      31.    The EPA provides the following simply schematic of the manufacturing process

18  for citric acid which includes the use of synthetic solvents like Sulfuric Acid:[18]

19

20

21

22

23

24  [16] Iliana E. Sweis, *et al.*, *Potential role of the common food additive manufactured citric acid in
     eliciting significant inflammatory reactions contributing to serious disease states: A series of

25  four case reports,* TOXICOL REP. 5:808-812 (2018), *available at*
     https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6097542/

26
     [17] *Id.*

27
     [18] **Exhibit D** at page 1, *available at* https://www.epa.gov/system/files/documents/2023-

28  03/Citric%20Acid%20Supply%20Chain%20Profile.pdf.

32.     The citric acid in the Products is made using GMO corn (see above image "Substrate (corn)").

33.     Dr. Ryan Monahan, a prominent functional medicine practitioner, notes that the "[p]resent day process of creating manufactured citric acid involves feeding sugars derived from GMO corn to black mold, which then ferments to form manufactured citric acid."[19] This is the reason why Defendants' indicate in tiny print on the back of the packing that the citric acid ingredient in the Products is a "bioengineered food ingredient[]" which is manufactured from "genetically modified crops." *See supra* at ¶ 21.

34.     Dr. Monahan also notes that "*Aspergillus niger* is associated with systemic inflammatory issues, including respiratory, gastrointestinal, neurological and musculoskeletal. Due to the potential for fragments of *Aspergillus niger* to make their way into the finished product of manufactured citric acid, this toxic inflammatory substance is likely being ingested by consumers of products containing citric acid. Even with high-heat processing to kill it, research has shown *Aspergillus niger* can still elicit an inflammatory response."[20]

---

[19] Dr. Ryan Monahan, *Citric Acid: A Common Food Additive With An Uncommon Source* (2024) *available at* https://www.peacefulmountainmedicine.com/post/citric-acid-a-common-food-additive-with-an-uncommon-source (Last visited May 15, 2024).

[20] Dr. Ryan Monahan, *Citric Acid: A Common Food Additive With An Uncommon Source* (2024) *available at* https://www.peacefulmountainmedicine.com/post/citric-acid-a-common-food-additive-with-an-uncommon-source.

FIRST AMENDED CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

35.      Clinical Nutritionist Serge Gregoire, notes that [f]ood manufacturers leave out that citric acid is derived from genetically modified black mold grown on GMO corn syrup" and that "[c]ompanies continuously capitalize on an ignorance-based market."[21] Gregoire states, "Citric acid production has become a refined and highly prized industrial process." Gregoire note that the *Aspergillus niger* used to produce citric acid is engineered to increase production of citric acid which has "resulted in countless generations of genetically modified mutant variants, now specialized for industrial-scale economics."

36.      "Further genetic modification in the lab has taken place through the engineering of the glycolytic pathway, resulting in a metabolic-streamlining that facilitates greater citric acid production from sugar while shutting off side avenues of glycolysis."[22]

37.      "Mutagenesis has been used in recent years to improve the citric-acid producing strains so that they can be used in industrial applications. The most common methods include the use of mutagens to induce mutations on the parental strains. The mutagens utilized for improvements are gamma radiation, ultraviolet radiation and often chemical mutagens. For hyperproducer strains, a hybrid method that combines ultraviolet and chemical mutagens is used (Ratledge & Kristiansen Citation2001)."[23]

38.      Below is a schematic representation of the metabolic reactions involved in citric acid production, the enzymes (italics), the known feedback loops (dashed lines) and their locations within the cellular structure of *Aspergillus niger*:[24]

---

[21] Serge Gregoire, Avoid citric acid: a mold byproduct! (July 13, 2021) *available at* https://www.linkedin.com/pulse/avoid-citric-acid-mold-byproduct-serge-gregoire/

[22] *Id.*

[23] Show, P. L., Oladele, K. O., Siew, Q. Y., Aziz Zakry, F. A., Lan, J. C. W., & Ling, T. C. (2015). Overview of citric acid production from Aspergillus niger. FRONTIERS IN LIFE SCIENCE, 8(3), 271–283, *available at* https://doi.org/10.1080/21553769.2015.1033653

[24] *Id.* at Figure 3.

CROSNER LEGAL, P.C.

1
2
3
4
5
6
7
8
9
10

CROSNER LEGAL, P.C.

11
12
13
14
15
16
17



18  39.    Dictionary definitions define "artificial" as something made by man. For

19  example, "artificial" is defined as "made by human skill; produced by humans …"[25] Merriam-

20  Webster's online dictionary states that "artificial" means "humanly contrived …"[26] Cambridge

21  Dictionary states that "artificial" means "made by people, often as a copy of something

22  natural."[27]

23
24

25  [25] *Artificial,* DICTIONARY.COM, *available at* https://www.dictionary.com/browse/artificial

26  [26] *Artificial*, MERRIAM-WEBSTER'S DICTIONARY, *available at* https://www.merriam-
27  webster.com/dictionary/artificial

28  [27] *Artificial*, CAMBRIDGE DICTIONARY, *available at*
https://dictionary.cambridge.org/us/dictionary/english/artificial

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROSNER LEGAL, P.C.

40.     Below are images of the chemical process used to create citric acid for use in food – a process that is visibly artificial:

 



**THE CITRIC ACID IN THE PRODUCTS IS A PRESERVATIVE**

41.     Citric acid acts as a preservative when added to food products, including the Products at issue. The Food and Drug Administration ("FDA") defines a preservative as "any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties." 21 C.F.R. §101.22(a)(5). The FDA has listed citric acid as a preservative

in its "Overview of Food Ingredients, Additives and Colors" as shown below:[28]

| Types of Ingredients | What They Do | Examples of Uses | Names Found on Product Labels |
|---|---|---|---|
| Preservatives | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, citric acid, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

42.     In a warning letter sent to Chiquita Brands International, Inc. and Fresh Express, Inc., the FDA warned that certain products were misbranded under the Federal Food Drug and Cosmetics Act because they "contain the *chemical preservatives ascorbic acid and citric acid* but their labels fail to declare these *preservatives* with a description of their functions. 21 C.F.R. [§] 101.22" (emphasis added).[29]

43.     The Encyclopedia Britanica also classifies citric acid as a preservative because it has antioxidant properties, as shown below[30]:

---

[28] *Overview of Food Ingredients, Additives & Colors,* FOOD AND DRUG ADMINISTRATION, *available at* https://web.archive.org/web/20220901032454/http://www.fda.gov/food/food-ingredients-packaging/overview-food-ingredients-additives-colors

[29] *See* **Exhibit A** at page 2 (highlighted).

[30] *Preservatives,* BRITANICA, *available at* https://www.britannica.com/topic/food-additive/Preservatives#ref502211

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

## Preservatives

Food preservatives are classified into two main groups: antioxidants and antimicrobials. Antioxidants are compounds that delay or prevent the deterioration of foods by oxidative mechanisms. Antimicrobial agents inhibit the growth of spoilage and pathogenic microorganisms in food.

**Food preservatives**

| chemical agent | mechanism of action |
|---|---|
| **Antioxidants** | |
| ascorbic acid | oxygen scavenger |
| butylated hydroxyanisole (BHA) | free radical scavenger |
| butylated hydroxytoluene (BHT) | free radical scavenger |
| citric acid | enzyme inhibitor/metal chelator |
| sulfites | enzyme inhibitor/oxygen scavenger |
| tertiary butylhydroquinone (TBHQ) | free radical scavenger |
| tocopherols | free radical scavenger |

44.    The Agricultural Marketing Service of the United States Department of Agriculture ("USDA") has also recognized the use of citric acid as a preservative stating that "Citric acid has a wide variety of uses, some of which can provide preservative functions, primarily though lowering the pH of the food."[31]

45.    The USDA's Food Safety Inspection Service's "Guideline for Label Approval" states that "common chemical preservatives include BHA, BHT, calcium propionate, citric acid, natamycin and sodium propionate."[32]

46.    Several academic journals also note the use of citric acid as a preservative.[33] Indeed, "Citric acid acts as a preservative in many processed foods, keeping them fresh. It does

---

[31] *Citric Acid and Salts*, UNITED STATES DEPARTMENT OF AGRICULTURE, *available at* https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf.

[32] FSIS Guideline for Label Approval, UNITED STATES DEPARTMENT OF AGRICULTURE, *available at* https://www.fsis.usda.gov/sites/default/files/media_file/documents/FSIS-GD-2023-0001.pdf

[33] K. Kirimura, et al., *Citric Acid*, COMPREHENSIVE BIOTECHNOLOGY (SECOND EDITION) (2011), *available at* https://www.sciencedirect.com/science/article/abs/pii/B9780080885049001690?via%3Dihub;

FIRST AMENDED CLASS ACTION COMPLAINT

this by slowing or helping prevent the formation of bacteria, mold, yeast, and fungus."[34] "Today, citric acid is one of the most common and widely-used preservatives in the world[.]"[35]

47.    Citric acid functions as a preservative in the Products regardless of whether Defendants intended to use citric acid as a preservative. Citric acid functions as a preservative even if it is also added to the Products for some other use. *See* 21 C.F.R. §101.22(a)(5) (defining preservatives as "any chemical that, when added to food, *tends to* prevent or retard deterioration") (emphasis added); *see also* Merriam-Webster's Dictionary (defining "preservative" as "something that preserves or *has the power of preserving*.") (emphasis added).[36]

48.    Citric acid acts as a preservative even when present at low levels. It will delay bacterial spoilage, delay changes in color, flavor, and texture of the product. Citric Acid acts to preserve the Products throughout the shelf-life of the Products. Because citric acid lowers the pH of the Products, it functions as a preservative by preventing or significantly delaying microorganisms such as mold, bacteria, fungi, and yeast from developing in the Products. Citric acid's antioxidant properties also assist in preservation by sequestrating unwanted compounds like metal ions from the Products.[37] A basic principle of food preservation is to impose numerous

K.M.S. Islam, *Use of citric acid in broiler diets,* WORLD'S POULTRY SCIENCE JOURNAL VOL. 68, ISSUE 1 (Feb. 21, 2012), *available at* https://www.cambridge.org/core/journals/world-s-poultry-science-journal/article/abs/use-of-citric-acid-in-broiler-diets/DA15C2C1F90667525BF2414DF3BFF646 ("Citric Acid (CA) is a weak organic acid which is a natural preservative and can add an acidic or sour taste to foods and soft drinks.").

[34] *What is citric acid, and what is it used for?,* MEDICAL NEWS TODAY (July 23, 2021), *available at* https://www.medicalnewstoday.com/articles/citric-acid

[35] *Citric Acid: One of the Most Important Preservatives in The World,* FBC INDUSTRIES, INC. (Feb. 5, 2019), *available at* https://fbcindustries.com/citric-acid-one-of-the-most-important-preservatives-in-the-world/

[36] *Preservative,* MERRIAM-WEBSTER'S DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/preservative?utm_campaign=sd&utm_medium=serp&utm_source=jsonld

[37] B.C. Behera, et al. *Microbial citric acid: Production, properties, application, and future perspectives*, FOOD FRONTIERS VOL. 2, 62-76 (Jan. 7, 2021), *available at* https://onlinelibrary.wiley.com/doi/pdf/10.1002/fft2.66

CROSNER LEGAL, P.C.

1    "hurdles" to prevent and delay degradation of the food product.[38] Here, the citric acid in the

2    Products does just that—it acts as a hurdle to unwanted spoilation of the Products.

3        49.    Citric acid is also a preservative because it is a sequestrant that prevents oxidation

4    and impedes microbial growth which slows degradation of the potato chips. Indeed, patents have

5    been issued regarding preserving potatoes and include citric acid as a preservative ingredient.

6    *See e.g.*, Thane R. Siddoway et al. (Jan. 8, 2015) US 2015/0010691 A1. Washington, DC. U.S.

7    Patent and Trademark Office.

8            **REASONABLE CONSUMERS ARE DECEIVED AND SUFFERED ECONOMIC INJURY**

9        50.    Consumers, like Plaintiffs, relied on Defendants' "No Artificial Colors, Flavors

10   or Preservatives" labeling statement. The "No Artificial Colors, Flavors or Preservatives"

11   statement on the labels of the Products is material to reasonable consumers.

12       51.    "[F]oods bearing 'free-from' claims are increasingly relevant to Americans, as

13   they perceive the products as closely tied to health … 84 percent of American consumers buy

14   free-from foods because they are seeking out more natural or less processed foods. In fact, 43

15   percent of consumers agree that free-from foods are healthier than foods without a free-from

16   claim, while another three in five believe the fewer ingredients a product has, the healthier it is

17   (59 percent). Among the top claims free-from consumers deem most important are trans-fat-free

18   (78 percent) and preservative-free (71 percent)."[39]

19       52.    Plaintiffs and the putative class members suffered economic injury as a result of

20   Defendants' actions. Plaintiffs and putative class members spent money that, absent Defendants'

21   actions, they would not have spent.

22

23

24   _____

[38] L. Leistner, *Basic aspects of food preservation by hurdle technology*, INTERNATIONAL
25   JOURNAL OF FOOD MICROBIOLOGY, VOL. 55, 181-186 (2000), *available at*
     http://envismadrasuniv.org/Physiology/pdf/Basic%20aspects%20of%20food%20preservation.
26   pdf

27   [39] *84% of Americans buy "free-from" foods because they believe them to be more natural or
     less processed*, MINTEL (Sept. 3, 2015), *available at* https://www.mintel.com/press-centre/84-
28   of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-
     processed/

CROSNER LEGAL, P.C.

53.    Plaintiffs and putative class members are entitled to damages and restitution for the purchase price of the Products and/or the price premium associated with the deceptive statements on the Products. Consumers, including Plaintiffs, would not have purchased Defendants' Products, or would have paid less for the Products, if they had known the Products actually contain an artificial preservative ingredient in citric acid.

## NO ADEQUATE REMEDY AT LAW

54.    Plaintiffs and members of the class are entitled to equitable relief as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Products more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

55.    The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes Defendants' overall unfair marketing scheme to promote and brand the Products, across a multitude of media platforms, including the product labels, packaging, and online advertisements, over a long period of time, in order to gain an unfair advantage over competitor products. Plaintiffs and class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

56.    A primary litigation objective in this litigation is to obtain injunctive relief in the form of a label or ingredient change. Injunctive relief is appropriate on behalf of Plaintiffs and members of the class because Defendants continue to misrepresent the Products as containing "No Artificial Colors, Flavors or Preservatives" when the Products actually contain the artificial preservative ingredient citric acid. Injunctive relief is necessary to prevent Defendants from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, public injunction is available under the

FIRST AMENDED CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

1
2
UCL, and damages will not adequately benefit the general public in a manner equivalent to an injunction.

3
### CLASS ACTION ALLEGATIONS

4
5
57.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following Classes:

6
**California Class**
7
All persons who purchased the Products for personal use in California within the applicable statute of limitations until the date class notice is disseminated.

8
9
**New York Class**
All persons who purchased the Products for personal use in New York within the applicable statute of limitations until the date class notice is disseminated.

10
11
(collectively referred to as the "Class")

12
13
58.    Excluded from the class are: (i) Defendants and their officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial officers and their immediate family members and associated court staff assigned to the case; (iv) individuals who received a full refund of the Products from Defendants.

14
15
16
17
59.    Plaintiffs reserve the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

18
19
60.    The Class is appropriate for certification because Plaintiffs can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

20
21
22
61.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of consumers who are Class Members described above who have been damaged by Defendants' deceptive and misleading practices.

23
24
25
62.    <u>Commonality</u>: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common

26
27
28

to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

    a.  Whether Defendants are responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

    b.  Whether Defendants' misconduct set forth in this Complaint demonstrates that Defendants engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Products;

    c.  Whether Defendants made misrepresentations concerning the Products that were likely to deceive the public;

    d.  Whether Plaintiffs and the Class are entitled to injunctive relief;

    e.  Whether Plaintiffs and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

63.    <u>Typicality</u>: Plaintiffs are a member of the Class that Plaintiffs seeks to represent. Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Products. Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

64.    <u>Adequacy</u>: Plaintiffs are adequate Class representative because Plaintiffs' interests do not conflict with the interests of the Class Members Plaintiffs seek to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiffs have a strong interest in vindicating the rights of the class; Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend to vigorously prosecute this action. Plaintiffs have no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiffs and proposed Class Counsel. Defendants have acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiffs and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

65.    The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.    The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.    The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.    When Defendants' liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.    This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.    Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among Class Members;

g.    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.    Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

66.    Additionally, or in the alternative, the Class also may be certified because Defendants have acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

67.    Plaintiffs seek preliminary and/or permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent

CROSNER LEGAL, P.C.

1  Defendants from engaging in the acts described, and to require Defendants to provide restitution

2  to Plaintiffs and the Class members.

3  68.    Unless the Class is certified, Defendants will retain monies that were taken from

4  Plaintiffs and Class members as a result of Defendants' wrongful conduct. Unless a classwide

5  injunction is issued, Defendants will continue to commit the violations alleged and the members

6  of the Class and the general public will continue to be misled.

7  **FIRST CLAIM FOR RELIEF**

8  **Violation of California's Consumers Legal Remedies Act**

9  **Cal. Civ. Code §§ 1750 *et seq.***

10  ***On behalf of the California Class***

11  69.    Plaintiff Squeo realleges and incorporates by reference all allegations contained

12  in this complaint, as though fully set forth herein.

13  70.    Plaintiff Squeo brings this claim under the CLRA individually and on behalf of

14  the Class against Defendants.

15  71.    At all times relevant hereto, Plaintiff Squeo and the members of the Class were

16  "consumer[s]," as defined in California Civil Code section 1761(d).

17  72.    At all relevant times, Defendants were a "person," as defined in California Civil

18  Code section 1761(c).

19  73.    At all relevant times, the Products manufactured, marketed, advertised, and sold

20  by Defendants constituted "goods," as defined in California Civil Code section 1761(a).

21  74.    The purchases of the Products by Plaintiff Squeo and the members of the Class

22  were and are "transactions" within the meaning of California Civil Code section 1761(e).

23  75.    Defendants disseminated, or caused to be disseminated, through its advertising,

24  false and misleading representations, including the Products' labeling that the Products contain

25  "No Artificial Colors, Flavors, or Preservatives." Defendants failed to disclose that the Products

26  contain an artificial preservative ingredient called citric acid. This is a material misrepresentation

27  and omission as reasonable consumer would find the fact that the Products contain an artificial

28

preservative to be important to their decision in purchasing the Products. Defendants' representations violate the CLRA in the following ways:

a. Defendants represented that the Products have characteristics, ingredients, uses, and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b. Defendants represented that the Products are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

c. Defendants advertised the Products with an intent not to sell the Products as advertised (Cal. Civ. Code § 1770(a)(9)); and

d. Defendants represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

76. Defendants violated the CLRA because the Products were prominently advertised as containing "No Artificial Colors, Flavors or Preservatives" but the Products contain an artificial preservative ingredient called citric acid. Defendants knew or should have known that consumers would want to know that the Products contain an artificial preservative.

77. Defendants' actions as described herein were done with conscious disregard of Plaintiffs' and the Class members' rights and were wanton and malicious.

78. Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendants are still representing that the Products have characteristics which they do not have.

79. Pursuant to California Civil Code section 1782(d), Plaintiff Squeo and the members of the Class seek an order enjoining Defendants from engaging in the methods, acts, and practices alleged herein.

80. Plaintiff Squeo has notified Defendant Campbell which is represented by the same counsel as Defendant Synder's-Lance in writing by certified mail of the alleged violations of the CLRA and demanded that Defendant Campbell rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. Defendants have not rectified or agreed to rectify the problems associated with the actions

CROSNER LEGAL, P.C.

1   detailed herein and give notice to all affected consumers within 30 days of the date of written

2   notice pursuant to section 1782 of the CLRA. Thus, Plaintiff Squeo seeks actual damages,

3   punitive damages, injunctive relief, and attorneys' fees and costs for Defendants' violations of

4   the CLRA.

5        81.    Pursuant to section 1780(d) of the CLRA, below is an affidavit showing that this

6   action was commenced in a proper forum.

7   <u>**SECOND CLAIM FOR RELIEF**</u>

8   **Violation of California's Unfair Competition Law**

9   **Cal. Bus. & Prof. Code §§ 17200 *et seq.***

10   ***On behalf of the California Class***

11        82.    Plaintiff Squeo realleges and incorporates by reference all allegations contained

12   in this complaint, as though fully set forth herein.

13        83.    Plaintiff Squeo brings this claim under the UCL individually and on behalf of the

14   Class against Defendants.

15        84.    The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or

16   practice and any false or misleading advertising.

17        85.    Defendants committed unlawful business acts or practices by making the

18   representations and omitted material facts (which constitutes advertising within the meaning of

19   California Business & Professions Code section 17200), as set forth more fully herein, and by

20   violating California's Consumers Legal Remedies Act, Cal. Civ. Code §§17500, *et seq.*,

21   California's False Advertising Law, Cal. Bus. & Prof. § 17500, *et seq.*, 15 U.S.C. § 45, and by

22   breaching express and implied warranties. Plaintiff, individually and on behalf of the other Class

23   members, reserves the right to allege other violations of law, which constitute other unlawful

24   business acts or practices. Such conduct is ongoing and continues to this date.

25        86.    Defendants committed "unfair" business acts or practices by: (1) engaging in

26   conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the members

27   of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or

28   substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct

CROSNER LEGAL, P.C.

that undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising. Plaintiff and the other Class members paid for a Product that is not as advertised by Defendants. Further, Defendants failed to disclose a material fact (that the Products contain an artificial preservative) of which they had exclusive knowledge. While Plaintiff and the other Class members were harmed, Defendants were unjustly enriched by its false misrepresentations and material omissions. As a result, Defendants' conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

87.     Defendants committed "fraudulent" business acts or practices by making the representations of material fact regarding the Products set forth herein. Defendants' business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Products actually contain no preservatives.

88.     Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendants' material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendants' Products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Products and Defendants' unlawful, unfair, and fraudulent practices.

89.     Defendants' wrongful business practices and violations of the UCL are ongoing.

90.     Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendants' unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

91.     Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Pursuant to California Business & Professions Code section 17203, Plaintiff, individually and on behalf of the Class, seeks (1) restitution from Defendants of all money obtained from Plaintiff and the other Class members as a result of unfair competition; (2) an injunction prohibiting Defendants from continuing such

1    practices in the State of California that do not comply with California law; and (3) all other relief

2    this Court deems appropriate, consistent with California Business & Professions Code section

3    17203.

### THIRD CLAIM FOR RELIEF

**Breach of Express Warranty under California Law**

***On behalf of the California Class***

7    92.    Plaintiff Squeo realleges and incorporates by reference all allegations contained

in this complaint, as though fully set forth herein.

9    93.    Plaintiff Squeo brings this claim for breach of express warranty individually and

on behalf of the Class against Defendants.

11    94.    As the manufacturer, marketer, distributor, and seller of the Products, Defendants

issued an express warranty by representing to consumers at the point of purchase that the

Products contain "No Artificial Colors, Flavors or Preservatives."

14    95.    Plaintiff and the Class reasonably relied on Defendants' misrepresentations,

descriptions and specifications regarding the Products, including the representation that the

Products contain "No Artificial Colors, Flavors or Preservatives."

17    96.    Defendants' representations were part of the description of the goods and the

bargain upon which the goods were offered for sale and purchased by Plaintiff and Members of

the Class.

20    97.    In fact, the Products do not conform to Defendants' representations because the

Products contain an artificial preservative ingredient called citric acid. By falsely representing

the Products in this way, Defendants breached express warranties.

23    98.    Plaintiff Squeo relied on Defendants' (the manufacturers) representations on the

Products' labels and advertising materials which provide the basis for an express warranty under

California law.

26    99.    As a direct and proximate result of Defendants' breach, Plaintiff Squeo and

Members of the Class were injured because they: (1) paid money for the  Products that were not

what Defendants represented; (2) were deprived of the benefit of the bargain because the

Products they purchased were different than Defendants advertised; and (3) were deprived of

CROSNER LEGAL, P.C.

the benefit of the bargain because the Products they purchased had less value than if Defendants' representations about the characteristics of the Products were truthful.

100.    Had Defendants not breached the express warranty by making the false representations alleged herein, Plaintiff Squeo and Class Members would not have purchased the Products or would not have paid as much as they did for them.

#### FOURTH CLAIM FOR RELIEF

**Violations of New York General Business Law § 349**

***On behalf of the New York Class***

101.    Plaintiffs Taylor realleges and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

102.    Plaintiff Taylor brings this claim on behalf of the New York Class.

103.    New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

104.    In their sale of Products throughout the state of New York, at all relevant times herein, Defendants conducted business and trade within the meaning and intendment of New York's General Business Law § 349.

105.    Plaintiff Taylor and the New York Class members are consumers who purchased the Products from Defendants for their personal use.

106.    By the acts and conduct alleged herein, Defendants engaged in deceptive, unfair, and misleading acts and practices by conspicuously representing on the packaging of the Products that they contain "No Artificial Colors or Flavors." Despite that representation, however, the Products contain an artificial preservative ingredient.

107.    The foregoing deceptive acts and practices were directed at consumers.

108.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the nature and value of the Products.

109.    As a result of Defendant's deceptive practices, Plaintiff Taylor and the New York Class members suffered an economic injury because they would not have purchased or would have paid less for the Products had they known the veracity of Defendants' misrepresentations.

110.    On behalf of herself and the New York Class members, Plaintiff Taylor seeks to recover actual damages or fifty dollars per unlawful transaction (i.e., for each sale of the Products), whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

### FIFTH CLAIM FOR RELIEF

**Violations of New York General Business Law § 350**

***On Behalf of the New York Class***

111.    Plaintiffs Taylor realleges and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

112.    Plaintiff Taylor brings this count on behalf of the New York Class.

113.    New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

114.    Defendants violated New York General Business Law § 350 by representing on the packaging of the Products that they contain "No Artificial Colors or Flavors." Despite that representation, however, the Products contain an artificial flavoring ingredient called citric acid.

115.    The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

116.    Defendants' misrepresentations have resulted in consumer injury or harm to the public interest.

117.    As a result of Defendants' false advertising, Plaintiff Taylor and the New York Class members suffered an economic injury because they would not have purchased or would have paid less for the Products had they known the veracity of Defendants' misrepresentations.

118.    On behalf of herself and the New York Class members, Plaintiff Taylor seeks to recover their actual damages or five hundred dollars per unlawful transaction (i.e., for each sale of the Products), whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

## REQUEST FOR RELIEF

Plaintiffs, individually, and on behalf of all others similarly situated, request for relief pursuant to each claim as follows:

119.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as the Class Representative and appointing the undersigned counsel as Class Counsel;

120.    Ordering restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class members as a result of Defendants' unlawful, unfair, and fraudulent business practices;

121.    Ordering injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, and ordering Defendants to engage in a corrective advertising campaign;

122.    Ordering damages in amount which is different than that calculated for restitution for Plaintiffs and the Class;

123.    Ordering statutory damages in the amount of $50 per transaction pursuant to New York General Business Law § 349 and statutory damages in the amount of $500 per transaction pursuant to New York General Business Law § 350;

124.    Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Class;

125.    Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

126.    Ordering other relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this Complaint.

Dated: June 6, 2024                    CROSNER LEGAL, P.C.


                                       By:    /s/ Craig W. Straub
                                              CRAIG W. STRAUB



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Michael T. Houchin (SBN 305541)
mhouchin@crosnerlegal.com
Kurt D. Kessler (SBN 327334)
kurt@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637

*Attorneys for Plaintiffs and the Proposed Class*

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

1

Civil Code Section 1780(d) Affidavit

2      I am an attorney duly licensed to practice before all of the courts of the State of

3 California. I am one of the counsel of record for Plaintiffs. This declaration is made pursuant to

4 § 1780(d) of the California Consumers Legal Remedies Act. Defendants have done, and are

5 doing, business in California, including in this district. I declare under penalty of perjury under

6 the laws of the State of California that the foregoing is true and correct.

7      Executed June 6, 2024 at San Diego, California.

8                                    By:      /s/ Craig W. Straub

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28